NEW YORK LIFE INSURANCE COMPANY v.
KUHLENSCHMIDT

[No. 27,475. Filed April 16, 1941 (original opinion filed February 25, 1941, superseded), and petition for rehearing denied.]

406

408

*Gavin & Gavin*, of Indianapolis, *Daniel H. Ortmeyer*, of Evansville, and *Louis H. Cooke*, of New York City, for appellant.

*Wilbur Clippinger* and *Winfield K. Denton*, both of Evansville, for appellee.

RICHMAN, J.—There have been two trials of this cause with an intervening appeal decided by this court December 17, 1937, with rehearing denied January 18, 1938. In our former opinion (same title) 213 Ind. 212, 11 N. E. (2d) 673, the issues were stated, and, except as may be necessary to clarify the subject-matter, will not be restated.

After the cause was remanded appellee filed reply to appellant's answer and also answer to appellant's cross-complaint, each alleging in substance that when the insured made his application, the falsity of which is relied upon as a defense, he was sound and well and had appellant known of insured's former illness and consultation with doctors nevertheless in accordance with the usage and custom of insurance companies generally such information would not have led to the rejection of the application or increase of the premium charged. Otherwise the issues raised by the pleadings were the same in both trials.

While in the first trial all issues were tried by the judge, in the second he tried only the issue of rescission raised by the cross-complaint and answer thereto and submitted all other issues to a jury who found for

appellee. After the verdict the judge made a general finding for appellee and entered judgment on the verdict and finding. Motion for new trial was overruled which is the only error assigned. In general the questions raised are, first, the sufficiency of the evidence to sustain, each, the verdict and finding; second, the propriety of certain instructions and refusals to instruct; and, third, whether error occurred in rulings on admission of evidence.

A preliminary question is raised by appellant's argument that our former opinion held that the statements in the application were warranties. Counsel evidently refer to the last paragraph on page 216 where it is said:

"that a deliberate false answer that the applicant had never consulted a physician concerning, or suffered from, any ailment or disease of the kidneys or bladder, and the false answer that he had never consulted any physician within five years, other than those named in the application, when, in fact, within a year he had consulted two physicians, one a specialist, and submitted to severe exploratory examinations, resulting in a diagnosis, afterwards confirmed, of a severe and painful ailment, are sufficient in themselves to establish fraud, which would make the statements warranties, and not representations, under the statute."

The same facts were proved in the second trial and appellant urges that having called the statements warranties we must now hold, their falsity being apparent, that their materiality is of no consequence and so the jury's verdict and the court's finding may be disregarded.

The effect of this argument is to say that we erred in the first appeal in not remanding the cause for restatement of the conclusions of law and judgment for appellant. Instead we ordered a retrial on the issue

of "whether the truth might reasonably have affected the company's judgment in writing the policy."

Apart from the context the language above quoted might be misleading but it is apparent that neither the trial court nor the parties were misled. Fraud of course does not make a warranty out of a representation. Nor is this accomplished by virtue of the statutory clause required in every policy of life insurance. § 39-801(5), Burns' 1940 Replacement, § 9723(5), Baldwin's 1934; § 39-4206(5) Burns' 1940 Replacement, § 9504-6(5), Baldwin's Supp. 1935. A warranty is created by appropriate language in the insurance contract and is made effective as such when fraud is shown. If there is no fraud, the language, though in terms of a warranty, is by the statute given the effect of a representation only. We made this subject clear in *Metropolitan Life Ins. Co. v. Becraft* (February 15, 1938), 213 Ind. 378, 383, 12 N. E. (2d) 952, 115 A. L. R. 93, as follows:

"Under the statute in question, actual fraud is only material in determining whether the statements are to be treated as representations or warranties. Where statements in a policy, *which according to the terms of the policy,* are to be treated as warranties, are false, the policy will be avoided if the statements were made fraudulently, irrespective of their materiality." (Our italics)

The defense in this case has not been grounded on warranty. The only language in the insurance contract that bears the semblance of a warranty is contained in Part II of the application immediately following the answer made to the medical examiner and reads:

"On behalf of myself and every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers that they are each written as made by me, and that each of them is

full, complete and true, and agree that the Company believing them to be true shall rely and act upon them."

This statement is copied into appellant's answer and was relied upon as a part of its defense but not as a warranty.

The answer avers that appellant did rely upon the statements and answers and issued the policy in the belief that each of them was in fact true and without knowledge or information to the contrary. But the answer continues with other averments characterizing its defense, including the following:

"That each of the said questions and the answers thereto related to a fact material and important to the risk to be assumed by said defendant by executing said policy and to the determination by the defendant of the question as to whether or not it would issue said policy and assume the risk thereof."

So far as we can ascertain from the record and the briefs of counsel, in both trials the principal issue was whether the misstated facts were material to the risk to be assumed. In our former opinion, page 220, we stated:

"That the case was tried below upon appellee's theory that the materiality of the false answers was to be determined from the standpoint of whether the ailments seriously affected the general health of the applicant, seems clear."

While in the second trial the standpoint was whether the company's judgment in writing the policy might have been affected if it had received true answers, in each trial the question was the materiality to the risk, an inquiry unnecessary when warranty plus fraud were present.

Not only is appellant's argument precluded because of the theory of the case but also because of the principle known as the law of the case. In § 1821 of the title "Appeal and Error," 5 C. J. S., p. 1267, it is stated:

"As a general rule, an adjudication on the first appeal is the law of the case on all subsequent appeals in which the facts are substantially the same."

Many Indiana cases are cited in this and succeeding sections where the reason for the rule and specific applications thereof are treated. In § 1832, p. 1286 the further statement is made:

"Although not expressly treated or discussed in the opinion, all questions necessarily involved on the appeal are the law of the case on all subsequent appeals."

See also 3 Am. Jur. § 990, p. 546 note 15; Annotation at 67 A. L. R. 1390 citing *Pittsburgh, etc., R. Co.* v. *Friend* (1924), 194 Ind. 579, 142 N. E. 709, 143 N. E. 879; *Mertz, Admr.,* v. *Wallace* (1931), 93 Ind. App. 289, 169 N. E. 333; and *Stickler* v. *Live Stock Ins. Assn.* (1920), 73 Ind. App. 508, 127 N. E. 831.

This court should not have ordered a new trial if the answers to the questions were warranted to be true. Necessarily, therefore, by our former mandate we determined either that the question of warranty was not before the court or that no warranty was shown.

The same principle disposes of appellant's second contention that the representations were material as a matter of law. All essential facts on this phase of the matter were the same in both trials. By ordering a new trial expressly on the issue of materiality we determined that we could not say as a matter of law

that the representations were material. This is the law of the case.

Turning now to the instructions we are confronted with appellee's contention that we may not consider any error dealing therewith because the motion for a new trial was too broad in that it applied to both the jury trial and the trial before the court on the issue of rescission. The question arises also as to the effect of this separation of the issues. The record shows that appellant moved that all issues be tried by the judge which motion was denied, and then requested that the equitable issue be tried first which also was refused. However the court did permit separate consideration of the issues, though in fact there was but one hearing when all of the evidence considered either by judge or jury was submitted to both at the same time. After the jury's verdict the court entered a general finding that the appellant was not entitled to rescission and at the same time entered judgment on the verdict. There was one motion for a new trial with separate assignments therein, one that the finding was not sustained by sufficient evidence, one that the verdict was not sustained by sufficient evidence, others that instructions were erroneously given or refused, others that the court erred in numerous rulings as to admission or exclusion of evidence. The rulings complained of as to instructions could of course apply only to the jury trial; those as to admission of evidence apply both to the trial before the jury and before the judge. We think the separate assignments sufficient to present the questions which we shall consider.

The record discloses that the only person in the employ of appellant who passed upon the application was a clerk in the rating bureau who testified that

it would not have been accepted had the facts of insured's previous illness and consultations with physicians been truly stated. Appellant's assistant medical director, who did not pass upon the application, testified that had he done so he would not have approved issuance of the policy if the truth had been disclosed. The medical examiners of two Indiana insurance companies, as appellant's witnesses, in answer to hypothetical and direct questions, stated that the insured's condition as disclosed by the testimony of his physicians constituted a serious medical impairment affecting the insurance hazard and that the applicant would have been rejected by them for their respective companies. Appellee called four witnesses, two physicians, an insurance broker, and a district manager of an insurance company each of whom testified in response to a hypothetical question that by the custom and usages of insurance companies generally an applicant would have been accepted under the circumstances outlined in the hypothetical question. Such in general was the evidence upon which this jury had to determine the materiality of insured's false representation.

Appellee tendered and the court gave the following instruction:

"If you find from the evidence that false statements were made by the insured to questions propounded to him when he applied for the policy of insurance sued on, the same would not avoid the policy unless they related to matters material to the risk and on this issue the court instructs you that the statements by the officers and employees of the defendant that they would not have accepted the risk or would have charged a higher rate therefor if they had known the true facts are not conclusive on this question but the same are to be considered by you with other evidence bearing on this question."

Appellant's objection is that this instruction singles out the testimony of certain witnesses and tells the jury that their statements were not conclusive thus bringing "this particular evidence into disrepute." On the other hand appellee argues that "most courts do not permit the admission of evidence of this kind," namely testimony of the company's representatives, but that since in Indiana, under *Metropolitan Life Ins. Co.* v. *Becraft, supra,* it is permitted, the jury should be instructed that it is not "conclusive." This conception evidently is derived from language in the Becraft opinion wherein the court was concerned with the question of admissibility not of weight of such testimony. The word "conclusive" is sometimes used in the sense of "determinative" but also may mean "convincing." The instruction was directed at the testimony of two persons only, designated as "officers and employees of the defendant." The jury could have understood the instruction as indicating that those witnesses were not to be credited to the same extent as other witnesses or that their testimony was not convincing. As a matter of fact if the jury chose to believe them their testimony was such as might be "determinative" of the issue of materiality.

In cases where opinion evidence is given as to sanity, amount of damages, and such questions, courts frequently give instructions designed to inform the jury that those opinions are not binding but are informative. Such was an instruction in *Cleveland, etc., R. Co.* v. *Simpson* (1915), 182 Ind. 693, 104 N. E. 301, 108 N. E. 9, cited by appellee. But in that case the court did not single out certain witnesses but commented on the general class of testimony, his instruction being applicable to the testimony of witnesses for both plaintiff

and defendant. No complaint was there made as to incorrect use of the word "conclusive." The case is thus distinguishable. So also are the cases of *Nordyke & Marmon Co.* v. *Whitehead* (1915), 183 Ind. 7, 106 N. E. 867; *Cleveland etc. R. Co.* v. *Hadley* (1908), 170 Ind. 204, 82 N. E. 1025, 84 N. E. 13, and other cases relied upon therein. Appellee further cites *McClure* v. *Lenz* (1907), 40 Ind. App. 56, 80 N. E. 988, which is not applicable for the instruction therein approved merely limited certain evidence to one of several issues.

We cannot approve an instruction that so easily may be understood as discrediting certain witnesses. The purpose sought to be accomplished could have been achieved by language unobjectionable. In view of our decision as to other errors we are not required to say whether the instruction was so prejudicial as to require reversal.

The fifth instruction given by the court on its own motion reads:

"I shall not indicate, or intend to indicate what your verdict will be or what has been proven by a preponderance of the evidence in this cause. It is solely your duty and province to decide the facts by a preponderance of the evidence, and for you to decide the same according to the law as given to you in these instructions, and you should receive no impressions of this cause from any other source *except as testified to by the witnesses* produced in this trial, and the law of this case in these instructions." (Our italics.)

The jury was by this instruction restricted to consideration only of testimony from the witness stand and the law given in the instructions. If they followed it literally they must have ignored documents and stipulations which were in evidence and the arguments of counsel. Perhaps also it excluded consideration of the demeanor of witnesses from which often a jury draws justifiable

conclusions as to the truth of the testimony. Even if they understood the word "testimony" as synonymous with "evidence," still the argument of counsel was excluded. A jury in an ordinary case needs no instruction as to the purpose or effect of argument. But it should not be instructed to "receive no impressions" therefrom. "If what is said in the arguments is not to be considered by the jury then they are useless and unavailing." *Metropolitan Life Ins. Co.* v. *Alterovitz* (1938), 214 Ind. 186, 206, 14 N. E. (2d) 570.

But appellee claims that by refusing to transfer the case of *Armstrong* v. *Binzer* (1936), 102 Ind. App. 497, 199 N. E. 863, this court approved an instruction like the one we are now considering. That instruction was that the jury

> "should receive no impressions of this cause from any other source whatsoever, except from the *evidence* as testified by the witnesses on the witness stand, and produced in the trial of the cause, and the law of this case as given you by the court in these instructions." (Our italics.)

The Appellate Court said this instruction did not exclude consideration of documentary evidence. The word "produced" was evidently thought to refer to "evidence" not "witnesses." With this interpretation, which we think permissible, any evidence might be considered, not merely testimony. The point was not made that consideration of argument of counsel was excluded. While we do not commend this instruction, it is not so objectionable as the one in the case at bar which we think was incurably erroneous.

Appellee asserts that we may not consider this error because of appellant's failure to comply with clause 6 of Rule 18 of this court in preparation of its brief. In the motion for a new trial cause No. 19 assigns error in giving this instruction. Point

4 cause No. 9 of appellant's "Propositions and Authorities" sets out a part of the instruction with reason and authority for its being erroneous. Obviously the figure "9" should have been "19" for in the brief no attack is made on appellee's instruction No. 5 the giving of which was cause No. 9 in the motion for new trial. The brief otherwise complies with the rules and we will not refuse to consider this error because of an obvious mistake in numbering which did not mislead or confuse the court.

Inasmuch as the judgment must be reversed and new trial granted we think it desirable to comment on other alleged errors in instructions which might again occur if not here noticed. Appellant tendered a number of instructions which were refused, among them one which it was held had been erroneously refused in the case of *Mutual Benefit Life Insurance Company* v. *Miller, Administratrix* (1872)., 39 Ind. 475, (the "Third" on p. 483) from which case we quoted in the former appeal (213 Ind. 217). The principal elements of this instruction were contained in other instructions given. We doubt if the facts of insured's illness were "exclusively within his own knowledge" inasmuch as his physicians had been informed of them. For that reason we cannot approve the instruction as applicable to the facts in this case. Instruction No. 10 was properly refused for it informed the jury that the misrepresentations were "material if they were of such a nature as that they did influence the judgment of the insurance company" in issuing the policy. The test of materiality is not that the company was influenced but that the facts if truly stated might reasonably have influenced the company in deciding whether it should reject or accept the risk. Instruction No. 12 was properly refused because it took from the jury

the question of materiality. The same thing is true of No. 16. Other questions as to instructions we need not consider as the language to which objection is made probably will be corrected in another trial.

As before stated a hypothetical question[1] was submitted by appellee to four of her witnesses. In each

---

[1] "Question: Now, assume these facts to be true that in July, 1929, a male farmer forty years of age reported to his physician relative to a pain in the region of his kidney and said physician believing said person to be suffering from a probable kidney stone referred said patient to Dr. Warren W. Hewins of Evansville, Indiana, a practicing physician and specialist of diseases of the urinary tract; that on July 19, 1929, the said patient consulted said Doctor Hewins complaining of pains at or near the region of his left kidney, giving a history of pain over a period of a month in intermittent attacks which grew in frequency but without bleeding and with a loss of weight of ten pounds in six weeks; that said physician made a physical and special examination of said patient, including a cystoscopic examination of the urinary tract, including dilation of the ureters, the application of argyrol to the kidneys and the application of water or boric acid to the bladder; that said examination caused some pain to the patient; that the kidneys were found thereupon to be normal as to size, shape and position, negative for stone, orifices from the kidneys normal; that Doctor Hewins was unable to determine whether there was a stricture or whether the ureter was naturally too small; that an X-ray was made of said patient for said purposes; that said physician thereupon diagnosed the patient's trouble as kidney stone probably in the ureters; that the patient consulted Doctor Hewins again on July 24 and August 2, 1929; that on August 2, 1929, the patient reported to Doctor Hewins that he thought he had passed a stone and on said date was examined by Doctor Hewins and by him discharged as sound and well; that the patient performed his usual farm work and other labor and duties and had no recurring attacks of said ailment or suffered no more from the same and was sound and well. That said patient on the 24th day of April, 1930, at the time he made application for a life insurance policy in the amount of two thousand dollars, underwent a physical examination by a physician, appointed by said insurance company, of Evansville, Indiana; that said examination by said physician showed and revealed that said applicant was sound and well as to kidneys and heart and other physical conditions, and in good health, and that said applicant was a good insurable risk at said time and that said physician so reported said condition of said applicant to said insurance company; that thereafter the policy applied for was issued and delivered on the 28th day of April, 1930, while said applicant and insured was in good health. Assuming those facts to be true, are you able to state from your knowledge of the practice and of usage among life insurance companies generally at said time, April 28, 1930, if the companies would have accepted said risk at normal rates?"

instance appellant's objections were the same. Grounds of objection were that the witness was not "qualified to express an opinion upon this question because it is a question requiring expert medical knowledge," that it "embraces facts which are contrary to the evidence," and that it called "for what action other companies would have taken," whereas appellant asserts the issue was what action appellant would have taken.

While we have held in *Metropolitan Life Ins. Co.* v. *Becraft, supra,* that "experts may give their opinion as to the materiality of the matter represented," we have not been called upon to decide what form such expert opinions should take. In Wigmore on Evidence (3rd Ed. 1940), § 1946, p. 60, p. 61, the learned author says:

> "A proper mode of obtaining aid, then, as to the insurer's practice in the matter, is to call in persons skilled in the insurance business, who may appropriately add to the jury's information on this subject. The form of question proper to be put would be: 'Would you as a professional insurer, and according to local practice, regard this concealed or misrepresented circumstance as material?' or, 'With reference to local practice, would this circumstance be regarded as increasing the risk?' or, 'as calling for a higher rate?' or, 'as bound to be communicated?' or, to the promisor himself or his agents, 'Would you according to your practice or rules have charged a higher rate of premium in view of this circumstance?' "

Mr. Wigmore adds that "this is the view accepted by a few courts only." On page 65 referring to this view he says:

> "A few Courts, however, adopt the correct theory (supra (b)); the result of which is that the question 'Was there in your opinion an increase of risk?' should properly not be asked, because the actual state of danger is immaterial, and therefore the witness' own estimate of it is immaterial; while insurance experts may of course be called to speak

as to the usage of the trade or of the insurer in charging higher rates for such circumstances."

In the footnotes to this text we find cited some of the cases relied upon as sustaining the method adopted by appellee, including *Penn Mutual Life Ins. Co.* v. *Mechanics' Savings Bank & Trust Co.* (C. C. A. 6th, 1896), 72 F. 413, 430, 38 L. R. A. 33, 63; *New York Life Ins. Co.* v. *Carroll* (1932), 154 Okla. 244, 251, 7 P. (2d) 440; and *Pacific Mut. Life Ins. Co.* v. *Arnold* (1935), 262 Ky. 267, 278, 90 S. W. (2d) 44.

The question which Judge Taft said was rightly rejected in the first of these three cases was "whether the misrepresented or concealed fact would be regarded among insurance companies generally as material." He added:

"The proper form in which the question might have been put to a duly-qualified witness was: 'Are you able to say, from your knowledge of the practice and usage among life insurance companies generally, that information of this fact would have enhanced the premium to be charged, or would have led to a rejection of the risk?' "

In the second case the Oklahoma Supreme Court quoting this rule held that the physician of the insurance company who passed medically upon the risk should not be permitted to testify "that had the interrogations complained of been answered by the insured properly, and he had not concealed the fact that he had the disease of syphilis, it would have been his duty not to approve the application." This ruling is in conflict with our holding in *Metropolitan Life Ins. Co.* v. *Becraft, supra.* It is to be noted that the Oklahoma case did not involve the form of a question to an expert witness.

The Kentucky case holds that "physicians who have acted for some time as medical examiners for insurance companies are qualified to express opinions as to whether

or not in accordance with the custom usually prevailing among those engaged in that business the particular applicant would have been accepted if his representations had been substantially true." The opinion adds "the plaintiff introduced three such physicians who testified that the facts forming alleged misrepresentations would not be regarded as material to the risk under the rule stated." Here again the form of the inquiry is only generally stated.

As explained by Judge Taft, afterwards Chief Justice, the rule permitting evidence of the practices of insurance companies generally was originally applied in marine insurance cases, was carried forward to fire insurance and is now extended to life insurance. In that process we think one important consideration must not be overlooked. The risks involved in marine and fire insurance are not usually such as to require any high degree of skill or knowledge to appraise. Whether or not the fact that a ship is bound for a certain port or has a certain cargo creates a greater or less hazard than if it has an undesignated port and cargo, is within the knowledge of ordinary men or at least men ordinarily engaged in marine insurance. So also is the fact of the location of a certain building as to the fire hazard. In such cases whether or not the representations in those respects are material may well be determined by the usages of marine or fire insurance companies generally and so also as to more technical questions as to hazard. But in the life insurance field many companies are specializing with selective or peculiar risks, and what life insurance companies generally would do about acceptance of a certain risk may be no criterion whatever as to the practice of a particular company in connection with that risk. After all the final inquiry is what that company might

reasonably have done. That is a good reason why the company's employee or official charged with the duty of passing thereon ought be permitted to testify what he would have done if the facts had been truly stated. But the evidence should not be limited to his testimony and for that reason we think that persons qualified may testify fully so as to develop the reasonableness of his possible action in the premises. And it seems to us that as the subject of inquiry becomes more technical, involved, or scientific, the trial court, within whose reasonable discretion is the determination of the qualifications of a witness, should exercise greater care in ascertaining that an offered witness is in a position to throw light on the question. An insurance solicitor without medical knowledge and unfamiliar with rating practices in life insurance is not likely to aid the jury in finding out what an insurance company would reasonably do under a given set of circumstances involving the diagnosis or prognosis of a disease considered from an actuarial or rating standpoint.

In this case with no showing that appellant's business was any different from that of the "mine run" of insurance companies operating in the field, we cannot say that a question asking for the usage and custom of insurance companies generally was not permissible. But we think the court should have exercised greater strictness in the form of the question and as to the qualifications of some of the witnesses who answered it.

This hypothetical question does not throw much light on the question before the jury, namely, the reasonable action of appellant had the truth been stated, but rather injects into the controversy an element that is entirely immaterial, namely the actual physical condition of the insured when he signed

the application and at other times when he is assumed to have been "sound and well." This is not what the jury was required to ascertain. Whether he was well or appeared to be well on that date does not at all tend to show that the facts concealed by his false answers were not material to the risk. The assumption that he was "sound and well" could not have been before the rating clerk when the examination was being considered. If the facts had not been falsely stated, question 8 in the application would have been answered to the effect that within a year prior thereto he had consulted Dr. Viehe who had sent him to Dr. Hewins, a specialist, for kidney trouble, that he passed a stone, and he had suffered severely. Probably not all facts detailed in the first part of the hypothetical question would have been stated in the answers written by the examiner but it would not have appeared that he was sound and well, but merely that the examiner had not found any trouble, when if he had been correctly informed, he might have made more searching examination. The picture as it would have appeared to the home office of the company if truthfully represented is the basis for any fair hypothesis as to what should reasonably have been done as to acceptance, rejection, or further investigation before action. This question does not present that picture. Appellee's witness, Dr. Ruddick, to whom it was put and who answered in the affirmative, on cross-examination stated that he based his opinion "upon the fact that the man was well on April 24th when this application was made." We do not see how he could have done otherwise or given a different answer. Appellee's two "experts" who were not physicians would have had to give the same answer in spite of their lack of qualification. If hypothetical questions are to be of any value in enabling a jury to reach a correct con-

clusion on a vital issue, the questions should be directed more specifically to that issue than was the one under consideration.

We are not to be understood as holding that expert testimony is to be limited to the kinds herein discussed. For instance, in a case of this general character we think it would be proper for a qualified physician, not necessarily acquainted with insurance practices, to testify that in his opinion a physical ailment or disability not revealed to the medical examiner was of a nature such as would not lead to any serious physical impairment or death. Such evidence would go to the reasonableness of the company's action and of the testimony of its employees who might have said that had they known the facts they would not have issued the policy. The converse situation was brought out by appellant's medical witnesses in this case by direct inquiry of them as to the serious character of the insured's undisclosed ailments for which he consulted the two physicians within a year prior to the application.

The principal question raised with respect to exclusion of evidence arises from the court's refusal to permit inquiry as to the effect of pyorrhea upon different organs of the body, including the heart, and the causes of mitral stenosis. It is apparent from the repeated offers and vigorous objections that appellant was concerned in having the jury informed there was a direct connection between the two, that is, that infection such as pyorrhea might result in the heart lesion from which death occurred; while appellee was just as much concerned in excluding the testimony so that there might be no adoption of the erroneous theory that caused the first verdict to be set aside.

The question was raised time and again. Dr. Ruddick, appellee's witness, was not permitted on cross-examination to answer the several questions: "What is mitral stenosis?" "What causes mitral stenosis?" Dr. McCullough, appellant's witness, who had testified that an infection, such as might be caused by pyorrhea, may set up an inflammation of the lining of the heart, was then asked: "If it spreads to the heart valves what is the disease known as?" After objection, offer to prove disclosed that his answer would be "mitral stenosis." Nor was this witness permitted to state the cause of mitral stenosis. Objection was sustained to a question to Dr. Young, appellant's witness, on direct examination: "What other diseases might pyorrhea produce?" His answer, as disclosed by the offer to prove, would have been "especially endocarditis and mitral stenosis." The court on appellee's motion struck out his answer to a definition of endocarditis and refused to permit him to say what were the "most usual causes" of endocarditis and mitral stenosis. The following question was put to Dr. McCullough: "I will ask you, doctor, what in accordance with the usages and customs of insurance companies the effect of pyorrhea has upon the acceptance or rejection of the risk?" Appellee's objection was sustained. It appears that he would have answered "if an examination shows that an applicant has pyorrhea that the policy will either be rejected or action thereon postponed for more than a year, and if then accepted will be accepted only at an increased rate of premium."

From these instances, which do not include all the assignments raising the same question, it is obvious that the inquiry as to causal connection between pyorrhea and mitral stenosis was not casual or unimportant nor considered such by the court or the parties. Dr.

Hewins had already testified that the kidney stone was due to an infection "above the neck" plus lack of drainage, which points to pyorrhea as a possible cause of that trouble. His testimony also disclosed that if applicant had made true answers, there would have been available to the company all information obtained by him when the applicant was being treated for the kidney trouble, including the facts that applicant then "had two teeth, upper, remaining, one crowned, both having pyorrhea, lower jaw fillings and gum rescission with pyorrhea" and that when discharged he still had pyorrhea.

Appellee contends that the teeth had been extracted shortly after the examination by Dr. Hewins, thus removing that source of infection, that there were no questions in the medical examination portion of the application that specifically inquired about pyorrhea, that appellant's answer did not rely upon that undisclosed condition as a defense, that the cause of death was immaterial, that appellant's letter of rescission denied liability only because insured suffered from kidney and heart trouble and had been treated by physicians therefor, and that in his opening statement counsel for appellant "did not deny that there was no connection between the alleged misrepresentation and insured's death."

The opening statement is not in the record. Appellant explains its position by stating "that to make its defense, a causal condition was not necessary," which is true. We do not think the admissibility of the evidence is to be determined by the statement ascribed to counsel.

Both the answer and the letter of rescission did rely upon heart and kidney trouble as undisclosed physical

conditions which were material and therefore ▮ grounds of defense. Dr. Hewins thought there might be a connection between the pyorrhea and the kidney trouble. If there was also any reasonable causal connection between the pyorrhea and the heart trouble we see no reason why that was not within the issues and a proper subject for inquiry. We are not to be understood as holding that it was necessary to prove that the concealed ailments caused the heart condition that resulted in death. This was the erroneous theory on which the case was first tried. Though such evidence might tend to prove such connection, the evidence is not for that reason to be excluded if otherwise it is admissible. The real basis for its admissibility is that the jury may know whether or not those undisclosed ailments were of such serious character as to put a medical examiner on guard for further specific inquiry and examination before the risk be accepted. These are facts that enter into the question of materiality to be decided by the jury.

For the reasons given we are of the opinion that it was error to exclude this testimony, which error not only went to the jury's verdict but to the court's ▮ decision. We are not unmindful of appellee's contention that the evidence was cumulative and therefore its exclusion was harmless. While there was some evidence along the lines of appellant's inquiry, the instances of refusal above cited show that the court was not excluding it because he thought the subject covered, but because he considered it inadmissible. It is not made to appear that appellant was not harmed by the erroneous rulings.

This opinion supersedes our original opinion in this cause filed February 25, 1941, and includes our views on the questions raised by appellee's petition for re-

hearing. Our conclusions make unnecessary the determination of the effect of the separate trial of the issue of rescission.

For the errors above discussed, some of which go both to the jury's verdict and the court's finding, the judgment is reversed and new trial ordered of all issues, and the petition for rehearing is overruled.

NOTE.—Reported in 33 N. E. (2d) 340, 135 A. L. R. 397.